FILED

2014 Sep-16  PM 12:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GENETTA BROWN,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:13-CV-00261-RDP** |
| | } | |
| **RELIANCE STANDARD LIFE** | } | |
| **INSURANCE COMPANY,** | } | |
| | } | |
| **Defendant.** | } | |

### <u>MEMORANDUM OPINION</u>

This case is before the court on the parties' Cross-Motions for Summary Judgment (Docs. # 22 & # 26),[1] both of which were filed on October 31, 2013.  The Motions (Docs. # 22 & # 26) have been fully briefed. (Docs. # 27, # 28, # 33, # 34).  For the reasons outlined below, after carefully reviewing the record and briefs and with the benefit of oral argument, Defendant's Motion (Doc. # 22) is due to be granted, while Plaintiff's Motion (Doc. # 26) is due to be denied.

### I.      Procedural History

This case was originally initiated by Plaintiff Genetta Brown ("Plaintiff") on January 3, 2013, in the Circuit Court of Jefferson County, Alabama, Bessemer Division.  Plaintiff's Complaint (Doc. # 1 at 13-30) included claims for breach of contract and bad faith.  The case was removed to the United States District Court for the Northern District of Alabama upon Defendant Reliance Standard Life Insurance Company's ("Defendant") filing of a Notice of

---

[1] Only Defendant's Motion for Summary Judgment (Doc. # 22) is currently characterized as a motion; however, both Defendant's Motion (Doc. # 22) and Plaintiff's Amended Initial Brief (Doc. # 26) move for substantive relief as to the same issue, and, as such, the court construes the Documents (# 22 & # 26) as Cross-Motions for Summary Judgment.

Removal (Doc. # 1) on February 6, 2013.  Plaintiff challenged Defendant's removal, filing a Motion to Remand (Doc. # 6) -- along with a Motion to Strike Defendant's Affirmative Defenses (Doc. # 7) -- on March 5, 2013.  By Order (Doc. # 13) dated April 1, 2013, this court denied the Motions (Docs. # 6 & # 7) and set the case for a status conference.  Following that conference, the court permitted the parties to engage in limited discovery on the issue of "whether the Policy at issue is covered by ERISA or is a governmental plan exempt from ERISA coverage," after which the parties were to file dispositive motions on the subject.  (Doc. # 14).  On October 31, 2013, Defendant filed a Consolidated Motion for Summary Judgment and Brief in Support Thereof Regarding the Applicability of ERISA (Doc. # 22), along with Evidentiary Materials (Doc. # 24).  That same day, Plaintiff filed an Amended Initial Brief on the Applicability of ERISA (Doc. #26), which she supplemented with Evidentiary Materials (Doc. # 25).  The parties filed their Responses (Docs. # 27 & # 28) on November 14, 2013, and submitted their Replies (Docs. # 33 & # 34) on November 21, 2013, rendering their Cross-Motions (Doc. # 22 & # 26) properly under submission.

During the briefing period, the court also received a Motion for Leave to File Amicus Curiae Brief on the Applicability of ERISA (Doc. # 29) from The Healthcare Authority for Medical West ("Medical West"), which the court granted over Defendant's Opposition (Doc. # 30) by Order (Doc. # 31) dated November 21, 2013.  Thereafter, Medical West filed its Amicus Brief (Doc. # 32), and Defendant filed a Response (Doc. # 36), both of which the court has reviewed and considered in reaching its decision.

## II.    Facts[2]

Plaintiff Genetta Brown ("Plaintiff") brings this suit both individually and as the executrix of the estate of her late husband, Enoch Brown, Jr. ("Brown").  In June 2004, Brown began working at Medical West as a supervisor in its Environmental Services Department. (Doc. # 1 at 17).   Brown obtained a life insurance policy with Defendant through his employment with Medical West.  (Doc. # 25, Ex. M-13, Pennington Dep. at 140-41).  In January 2008, Brown was diagnosed with lung cancer.  (Doc. # 1 at 18).   After Brown's death in February 2011, Plaintiff submitted a claim for death benefits, but it was rejected by Defendant. (Doc. # 1 at 20).  Thereafter, Plaintiff brought suit against Defendant, alleging breach of contract and bad faith.  (Doc. # 1 at 13-30).

Prior to 2002, Medical West was known as Bessemer Carraway Medical Center ("BCMC") and was owned and operated by an Alabama nonprofit corporation of the same name. (Doc. # 25, Ex. K-2).  In February 2002, BCMC entered into an Affiliation Agreement with UAB Health System ("UABHS"), at which point BCMC's name was changed to UAB Medical West.  (Doc. # 25, Ex. M-13, Pennington Dep. at 114-16; Doc. # 25, Ex. A-3).  UABHS is an Alabama nonprofit corporation that manages hospitals and is comprised of two entities: the Board of Trustees of the University of Alabama ("UA Board") and the University of Alabama Health Services Foundation, P.C.  (Doc. # 25, Ex. A-2).  In December 2005, the UA Board, UABHS, UAB Medical West, and the Western Health Services Foundation ("Foundation"), an Alabama private nonprofit corporation, entered into a new Affiliation Agreement (Doc. # 25, Ex.

---

[2] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only.  They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

D-4), pursuant to which all of UAB Medical West's assets, liabilities, and employees were transferred to a health care authority -- The Healthcare Authority for Medical West, an Affiliate of UAB Health System -- created by the UA Board.  (*See generally* Doc. # 25, Ex. C-3).  The Healthcare Authority for Medical West ("Medical West") is controlled by an eleven-member board of directors (six of whom are selected by the UA Board) and is required to pay UABHS twenty-five percent of its net income each year.  (Doc. # 25, Ex. C-3; Doc. # 25, Ex. M-13, Pennington Dep. at 125, 128).  Like all other health care authorities in the State of Alabama, Medical West was created pursuant to the Health Care Authorities Act of 1982 (the "HCA Act"), Alabama Code § 22-21-310 *et seq.*  (Doc. # 25, Ex. C-1).

The HCA Act vests counties, municipalities, and educational institutions with the power to create "public corporations whose corporate purpose shall be to acquire, own and operate health care facilities."  Ala. Code § 22-21-312.  Such corporations are referred to as health care authorities and are vested with numerous powers and quasi-governmental characteristics.  *Id.* § 22-21-318.  For instances, health care authorities are exempt from any state, county, or municipal taxes (*id.* § 22-21-333), have the power to issue tax-exempt bonds (*id.* § 22-21-330), and potentially, have the power of eminent domain (*id.* § 22-21-319).  Medical West bears all of these hallmarks of a health care authority.  (Doc. #25, Ex. C-2 & C-3).

However, a health care authority is distinct in many ways from a quintessential governmental entity.  For instance, health care authorities do not have the power to levy taxes (Ala. Code § 22-21-318(d)), they are not subject to Alabama's competitive bid requirements (*id.* § 22-21-335), their directors' meetings are not subject to Alabama's Open Meeting Act (*id.* § 22-21-316(c)), and their directors, officers, and employees are not covered by the State's ethics laws (*id.* § 22-21-334).  Likewise, the debts and obligations of a health care authority are not imputed

to the State of Alabama or its political subdivisions.  *Id.* § 22-21-325.  And, in this specific instance, Medical West has limited, state-imposed financial reporting requirements (*e.g.*, it is not required to report its income or expenditures to the state). (Doc. # 25, Ex. M-13, Pennington Dep. at 68-69).  Medical West receives no appropriations from the State of Alabama (*id.* at 77-78), and Medical West maintains an employee benefits plan that is separate and apart from that applicable to state employees.  (*Id.* at 37).

### III.   Discussion

After careful review of the parties' briefs and evidentiary submissions, and for the reasons stated below, the court concludes that Defendant's motion should be granted and Plaintiff's denied.

Pursuant to this court's Order (Doc. # 14), the parties engaged in limited discovery on the question of "whether the Policy at issue is covered by ERISA or is a governmental plan exempt from ERISA coverage."  (Doc. # 14 at 1).  They have since filed dispositive motions (Docs. # 22 & # 26), with Plaintiff arguing that the underlying policy is part of a "governmental plan" (and thus, is exempt from ERISA), and Defendant asserting that it is not (and thus, is subject to ERISA).

Although ERISA casts a wide net, an employee benefit plan can nevertheless evade that broad coverage if it is a statutorily exempt.  *See* 29 U.S.C. § 1003(b).  ERISA specifically exempts five categories of employee benefit plans: (1) government plans; (2) church plans; (3) plans established solely for complying with workers' or unemployment compensation or disability insurance laws; (4) plans maintained outside the United States primarily for nonresident aliens; and (5) unfunded excess benefits plans.  *Id.* § 1003(b)(1)-(5).  As such, under ERISA, those employee benefit plans that are deemed to be "governmental plans" are exempt

from the statute's coverage. *Id.* § 1003(b)(1). ERISA defines a "governmental plan" as: "A plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing . . . ." *Id.* § 1002(32). As the employee benefit plan upon which Plaintiff's suit is based was established by Medical West, the question before this court is whether Medical West is (1) a "political subdivision" or (2) an "agency or instrumentality" for purposes of ERISA's "governmental plan" exemption.

Whether a given entity is a "political subdivision" or "agency or instrumentality" is a question of federal law. *Rose v. Long Island R.R. Pension Plan*, 828 F.2d 910, 915 (2d Cir. 1987). ERISA fails to define these terms, and the Eleventh Circuit has yet to weigh in on their construction in the context of ERISA's "governmental plan" exception. However, many district courts within the Circuit have grappled with the issue. *See, e.g.*, *Williams-Mason v. Reliance Std. Life Ins. Co.*, 2006 U.S. Dist. LEXIS 40052 (S.D. Ga. June 16, 2006); *Germaine v. Unum Life Ins. Co. of Am.*, 2004 U.S. Dist. LEXIS 24019 (N.D. Ga. Sept. 23, 2004); *Dickerson v. Alexander Hamilton Life Ins. Co.*, 130 F. Supp. 2d 1271 (N.D. Ala. 2001); *Hutto v. Blue Cross & Blue Shield of Ala.*, 1997 U.S. Dist. LEXIS 16386 (M.D. Ala. June 9, 1997); *Culpepper v. Protective Life Ins. Co.*, 938 F. Supp. 794 (M.D. Ala. 1996).

In addition, although the Eleventh Circuit has not addressed this particular question, other courts of appeal have. Those courts have looked elsewhere for guidance in determining the meaning of those terms. For instance, in attempting to define "political subdivision," the Second, Third, and Seventh Circuits have utilized the "NLRB Test,"[3] which was promulgated by the NLRB and adopted by the Supreme Court in the context of determining what amounts to a

---

[3] *Rose*, 828 F.2d at 915-17; *Koval v. Wash. Cnty. Redevelopment Auth.*, 574 F.3d 238, 242 (3d Cir. 2009); *Shannon v. Shannon*, 965 F.2d 542, 547-48 (7th Cir. 1992).

"political subdivision" under the National Labor Relations Act. *NLRB v. Natural Gas Util. District*, 402 U.S. 600, 604-05 (1971). Under the NLRB Test, an entity constitutes a "political subdivision" if it is "either (1) created directly by the state, so as to constitute departments or administrative arms of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate." *Id.*

Similarly, when attempting to determine whether an entity is a governmental "agency or instrumentality," courts have looked to provisions of the Internal Revenue Code for guidance. *See Rose*, 828 F.2d at 916; *see also Dickerson*, 130 F. Supp. 2d at 1275; *Culpepper*, 938 F. Supp. at 797. The Revenue Ruling that accompanies the IRS's "governmental plan" definition -- which is nearly identical to ERISA's governmental plan definition -- considers six factors in determining whether an entity is a governmental agency or instrumentality:

(1)     whether it is used for a governmental purpose and performs a governmental function;

(2)     whether performance of its functions is on behalf of a state or political subdivision;

(3)     whether there are private interests involved, or whether the states or political subdivisions involved have the powers and interests of an owner;

(4)     whether control and supervision of the organization is vested in a public authority;

(5)     if express or implied statutory or other authority is necessary for the creation or use of such an instrumentality, and whether such authority exists; and

(6)     the degree of financial autonomy and the source of its operating expenses.

*See* Rev. Rul. 57-128, 1957-1 C.B. 311. In the absence of direction from the Eleventh Circuit, this court concludes that the decisions of the Second, Third, and Seventh Circuits are persuasive. Accordingly, consistent with these opinions, the court will apply the NLRB test and the IRS factors in its evaluation of Medical West's governmental status as either a "political subdivision" or an "agency or instrumentality" of the State.

### A.   Medical West Is Not a "Political Subdivision" Within the Meaning of ERISA

In spite of the HCA Act's confusing use of terminology,[4] it seems clear that Medical West does not constitute a "political subdivision" for purposes of ERISA. The court fully understands the argument that the UA Board exerts *de facto* control over Medical West (as the UA Board controls six of the directorships on Medical West's eleven-member board), and the members of the UA Board are public officials.[5] Regardless, Medical West satisfies neither prong

---

[4] The HCA Act establishes that a health care authority is entitled "[t]o exercise all powers granted [by the statute] . . . , notwithstanding that as a consequence of such exercise of such powers it engages in activities that may be deemed "anticompetitive" within the contemplation of the antitrust laws of the state or of the United States." Ala. Code § 22-21-318(a)(31). The statute continues, providing that "[a]s a basis for the power granted in [the aforequoted provision], the Legislature hereby: (2) Determines, as an expression of the public policy of the state *with respect to the displacement of competition in the field of health care*, that each authority, when exercising its powers hereunder with respect to the operation and management of health care facilities, acts as an agency or instrumentality of its authorizing subdivisions and as a political subdivision of the state." Ala. Code § 22-21-318(c) (emphasis added). Plaintiff seizes on the preceding language, broadly asserting that "[t]he enabling provision of the HCA states that a health care authority 'acts as an agency or instrumentality of its authorizing subdivisions and as a political subdivision of the state.' " (Doc. #26 at 2). However, Plaintiff's assertion, no doubt intended to sway the court's "governmental plan" determination, misunderstands the statute, and fails to acknowledge the context in which the terms "agency or instrumentality" and "political subdivision" were used. Indeed, the plain language of the statute indicates that health care authorities are to be considered governmental entities *only* for purposes of antitrust evaluation, so as to allow such authorities to engage in anticompetitive conduct. *See Health Care Authority for Baptist Health v. Davis*, 2013 WL 2149493 at *9 (Ala. 2014) ("[I]t is apparent that the legislature has stated than a health-care authority acts as an agency or instrumentality of its authorizing subdivision and as a political subdivision of the State only in connection with its engagement in anticompetitive conduct."). As such, the court places little weight on the Alabama Legislature's use of the terms as it relates to the issue presently before the court and this limitation distinguishes this case from decisions such as *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438 (11th Cir. 1991) (finding DCH, a hospital organized under the Alabama HCA, was a local governmental entity for purposes of antitrust analysis). *See Askew v. DCH Healthcare Auth.*, 995 F.2d 1033 (11th Cir.) (same), *cert. denied*, 510 U.S. 1012 (1993); *accord Dellocono v. Thomas Hosp.*, 894 So. 2d 694, 697 (Ala. Civ. App. 2004) ("It is clear that the holdings in *Askew* and *Todorov* are limited to antitrust cases . . . .").

[5] Alabama's Code of Ethics defines public official as: "Any person elected to public office, whether or not that person has taken office, by the vote of the people at state, county, or municipal level of government or their instrumentalities, including governmental corporations, and any person appointed to a position at the state, county, or municipal level of government or their instrumentalities, including governmental corporations. For purposes of this chapter, a public official includes the chairs and vice-chairs or the equivalent offices of each state political party as defined in Section 17-13-40. Ala. Code § 36-25-1. The UA Board has two public officials that sit as *ex officio* members by virtue of their respective offices, namely, the Governor and the Superintendent of Education of the State of Alabama. *See* Board of Trustees of the University of Alabama, Board Manual, art. 1, § 1 (Rev. 2013). The remaining board members however are elected by the UA Board itself. *See id.* Three members are elected by the Board from the congressional district in which the Tuscaloosa campus is located, and two members are elected from each of the other congressional districts in the State of Alabama. *See id.* Each trusteeship is subject to confirmation by the Alabama Senate. *See id.* at art. 1, § 2. It is undisputed that the UA Board is an instrumentality of the State of Alabama. It follows that any person elected or appointed by the UA Board and each member of the UA Board is a public official.

of the widely-used "NLRB Test": (1) it was not created *directly* by the State of Alabama itself, but rather by an arm of the State (*i.e.*, the UA Board), and (2) its administrators are not responsible to public officials or the general electorate.  Furthermore, as the UA Board's powers of oversight are much more circumscribed than that which appears to be contemplated by the second prong of the NLRB Test, it makes little sense that the Alabama Legislature would grant entities other than the State itself the power to create political subdivisions of the State (*e.g.*, counties, municipalities, and educational institutions).

> **B.     Medical West Is Not a Governmental "Agency or Instrumentality" Within the Meaning of ERISA**

Likewise, the court concludes -- after careful consideration of the IRS's six "agency or instrumentality" factors -- that Medical West is not an "agency or instrumentality" for purposes of ERISA.  Some of the IRS factors (*e.g.*, control exercised by public authority and creature of statute) may weigh in favor of construing Medical West as an "agency or instrumentality," and others (*e.g.*, performance on behalf of state or its political subdivisions and ownership interests of the state or its political subdivisions) fail to break one way or the other.  But here, the fact that Medical West does not perform a governmental function and enjoys nearly complete financial autonomy convinces this court that Medical West should not be considered a governmental "agency or instrumentality" for purposes of ERISA.

---

Previous versions of the ethics law clarified that the definition of public official: "excludes members of all other boards not named including but not limited to those commissions, committees, councils, boards of authorities, functioning solely for cultural or historical purposes and advisory board members and members of boards of trustees of institutions of higher learning of the State of Alabama."  *See Comer v. City of Mobile*, 337 So. 2d 742, 747 (Ala. 1976) (quoting Ala. Code § 36-25-1(11), Code 1975).  This clarifying language has been removed.  The court will not look beyond the plain language of the current statute in resolving this question.

### 1.      Governmental Purpose or Function

Contrary to Plaintiff's assertions (Doc. # 26 at 22-24), Medical West is not used for a governmental purpose and does not perform a governmental function.  The court reaches this conclusion for the following reasons.

While it is true that "[t]he Authority's stated purpose is to promote the public health of the people of Alabama and to ensure access to primary and secondary care in Bessemer" (*id.*), such a mission evinces a *public* function, not necessarily a *governmental* one.  This public versus governmental distinction, delicate as it may be, has previously been recognized by the Supreme Court of Alabama in *The Health Care Authority for Baptist Health v. Davis*, in which the court noted as follows:

> [a]lthough the powers to arrange for the provision of health-care services to the indigent and to promote public health are legitimate ends of government, they certainly are not functions unique to government.  Thus, the power granted authorities under the HCA Act in this regard . . . is not of the same character, for example, as the power granted an entity that is charged with a strictly government function, *e.g.*, law enforcement.

*Davis*, 2014 WL 2149493, at *6.   Contrary to Defendant's argument, *Davis*'s ultimate conclusion that The Health Care Authority for Baptist Health "is an entity separate from the State and from the persons and entities who participated in its creation" is not dispositive as to the federal question presently before this court.

After quoting from *Davis* in his initial brief, Defendant asserts that:

> [t]he inquiry really ends there.  As held by the Supreme Court of Alabama, because Medical West is a public corporation, it is an entity separate from the State and from the persons and entities who participated in its creation.  Therefore, as held in *Davis*, it is not a governmental entity.  Consequently, the government sponsored employee benefit plan exception to ERISA does not apply.

(Doc. # 22 at 12).  The court declines to afford *Davis* the level of precedential value advocated by Defendant for two reasons.  First, to do so would ignore the *Rose* court's well-taken reminder that federal law, not state law, controls on the issue of whether a given entity constitutes a "political subdivision" or an "agency or instrumentality" under ERISA.  *Rose*, 828 F.2d at 915.  Second, such an invitation fails to recognize that *Davis* was rendered in the context of an inquiry into state immunity.  *Davis*, 2014 WL 2149493 at *4.  To be sure, and as already noted, *Davis* does have persuasive value -- particularly as it relates to whether health care authorities authorized by state law perform a state governmental function -- and the court has factored that decision into its analysis.  But even taking full account of *Davis*, the court is not persuaded that Medical West serves a governmental purpose or function.

Plaintiff also suggests that Medical West fulfills a government function because it was designed to specifically address the problem of indigent care in its surrounding area (Oral Arg. Tr. at 5-7, 12, Sept. 4, 2014).[6]  This assertion is wide of the mark for at least two reasons.  First, Medical West's Affiliation Agreement and other governing documents (Doc. # 25-1) fail to mention this purpose at all.  Second, every hospital and healthcare provider exists (or at least is called upon) to provide indigent care; indeed, the law imposes this duty on many *private* health

---

[6] In response to the court's inquiry into governmental function and purpose, Plaintiff responded at oral argument on the issue as follows:

Q: Brookwood has a hospital in town. St. Vincents has a hospital in town, Trinity . . . . Those aren't governmental entities. They provide the same functions, though right? Isn't it more of a public function as opposed to a governmental function that medical center west and even UAB might perform?

A: But I think the difference is that the Health Care Authority act was passed to address a specific need of providing indigent care to citizens of in the State of Alabama.

(Oral Arg. Tr. at 5, Sept. 4, 2014).

care providers through various statutes and regulatory schemes.[7]   It is clear indigent care is merely a single aspect of Medical West's overall purpose — promoting public health and providing public health care.  Medical West is not unique in this regard; the mere provision of medical services, even to the indigent, is not a governmental function.  There are many private hospitals in Alabama (and elsewhere) that provide this service.[8]  It is a public function.

For these reasons, the court concludes that Medical West does not perform a governmental function, lending credence to the idea that Medical West is not a governmental "agency or instrumentality" within the meaning of ERISA.

### 2.   Performance on Behalf of State or Its Political Subdivisions

After a careful review of the record, the court notes that it is unclear whether Medical West "performs on behalf of" the State of Alabama or its political subdivisions.  Plaintiff argues Medical West "carried out [its governmental] function for the UA Board, and it does so under the exclusive direction and control of the UA Board. . . . [Medical West's] Board is controlled by the UA Board, thus providing indicia of being a governmental entity."  (Doc. # 26 at 30).  As Plaintiff correctly notes, this factor is related to two different questions the court must answer: (1) whether the entity serves a governmental function or purpose; and (2) whether an entity is controlled and supervised by a political subdivision of the State.  The Rule 56 evidence indicates that while Medical West does not serve a strictly governmental function or purpose, it is, to some extent, arguably controlled and supervised by the UA Board — a political subdivision of the State.  Therefore, this inquiry cuts in both directions.

---

[7] For example, the Emergency Medical Treatment & Labor Act ("EMTALA") requires all Centers for Medicare and Medicaid Services-participating hospitals (*i.e.*, almost every hospital) to provide emergency care to all individuals seeking care irrespective of ability to pay.  42 U.S.C. § 1395dd.

[8] To the extent Plaintiff suggests that Medical West is an agent or instrumentality of the government necessary to meet the needs of the indigent population of Bessemer, it is interesting to note that the government not only did not mention this in Medical West's Affiliation Agreement, but also failed to provide the presumably necessary financial means to support this end.

On the one hand, Medical West performs the public function -- as opposed to a governmental one -- of promoting the public health "on behalf of" the State.  On the other, as Plaintiff notes, Medical West may perform "on behalf of" the UA Board, at least to the extent that the UA Board exerts control over that public corporation.  This so-called "control" is a function of the UA Board's power to appoint the majority of the members of Medical West's Board.  A closer look at the circumstances of this case, however, reveals that this later "control" argument conflates two of the IRS factors.

A conclusion that because Medical West is "controlled by" the UA Board it necessarily follows that Medical West performs its functions "on behalf of" the UA Board is problematic for at least three reasons.  First, it renders the fourth factor of the IRS test redundant.  Under the IRS six-factor test, "performance on behalf of the state" is a unique and independent factor, distinct from the "control and supervision" inquiry.  There may be interlocking facts that affect the analysis of the two issues, but the inquiries are substantively distinct.[9]  Second, and as more fully explained below, merely because the UA Board appoints six of the eleven members of the Medical West Board does not mean that the former controls the latter.  In this case, because the court questions whether the UA Board actually controls and supervises the Medical West Board, it cannot say on that basis that alone Medical West performs on behalf of the UA Board.  Finally, and in any event, standing alone, a finding that the UA Board may exercise some amount of control and supervision over Medical West is insufficient to win the argument that Medical West performs on behalf of the UA Board.  This factor is at best indeterminate, and regardless, as will

---

[9] Of course, the court is cognizant that these two factors may often point to the same result, as an entity that performs on behalf of a state is often, to some degree, controlled and supervised by the state.  In many cases, attempting to discern the contours of the second and fourth factors is likely to create a distinction without a difference.

be revealed, the governmental function and financial autonomy factors are more critical to this court's analysis.

### 3.  State Ownership

Medical West is not wholly owned by the State of Alabama or its political subdivisions; therefore, at best, this factor is indeterminate.  In reality, pursuant to the Affiliation Agreement between the UA Board, UABHS, UAB Medical West (an entity different than Medical West), and the Foundation, Medical West is a separate public corporation authorized to own and operate a hospital and health care delivery system.  Under Alabama law, "a public corporation is a separate entity from the state and from any local political subdivision."  *Ala. Hosp. Ass'n v. Dillard*, 388 So. 2d 903, 905 (Ala. 1980).  The Affiliation Agreement has the effect of (1) transferring the assets of UAB Medical West to the ownership and operation of Medical West, a health care authority, and (2) outlining the joint governance rights and responsibilities of each of the interested parties.  Thus, Medical West may best be considered a joint venture by and among each of the interested parties as co-owners.

For example, the presence of a purchase option in favor of a private entity further indicates that Medical West is not solely, or even primarily, owned by the State of Alabama or one of its political subdivisions.  (*See* Doc. # 25, Ex. D-4 at 7-8).  Upon dissolution, the Foundation has the right to repurchase the hospital and related assets.  (*Id.*)  The purchase option indicates that while the government *may* one day own the assets of Medical West, that will be the case if -- and only if -- dissolution occurs and *the Foundation* fails to exercise the purchase option.  (*Id.*)  Until that daily double occurs, Medical West is not wholly owned by the State.[10]

_____

[10] Furthermore, the later disposition of net proceeds upon the sale of Medical West by the Foundation under the Affiliation Agreement illustrates the ambiguity in divining ownership.  Upon the Foundation's sale of Medical West within the five-year term governed by the Affiliation Agreement, the net proceeds are distributed as follows:

(i)   the Foundation receives sale proceeds in an amount equal to the net book value of the hospital;

Nor does Medical West resemble a state-owned entity.  The State is not responsible for the debts and obligations of Medical West (Ala. Code § 22-21-325), and Medical West may be sued in its own name (*Id.* § 22-21-318(a)(2)).  Medical West remits (by virtue of a contract) only 25 percent of its net income to the State, and Medical West receives no appropriations from the State of Alabama. (Doc. # 25, Ex. M, Pennington Dep. at 77-78).  Medical West is not required to report its income or expenditures to the State.  (Doc. # 25, Ex. M, Pennington Dep. at 68-69).

Ultimately, for all these reasons, the court finds that the Rule 56 evidence fails to establish that the State is the owner of Medical West for purposes of determining whether or not Medical West is an "agency or instrumentality" under ERISA.

### 4.  Control and Supervision

As mentioned above, on first blush it may appear that, to the extent that control of Medical West is vested in the UA Board, the control and supervision factor appears to weigh in favor of construing Medical West as an "agency or instrumentality."  Plaintiff argues that Medical West carried out its function under the "*exclusive* direction and control" of the UA Board, a political subdivision or state agency.[11]  (Doc. # 26 at 30) (emphasis added).  But this is

---

(ii)  the Foundation receives sale proceeds equal to the "Change in Value" of Medical West; and
(iii) the Foundation and UAB Health Systems will split the excess evenly.

(*See* Doc. # 25, Ex. D-4 at 7-8).

[11]    *See Eubank*, 210 F.App'x at 844 ("The University of Alabama Board of Trustees is a state agency . . . .").  "The Alabama Supreme Court has held on at least two occasions that state universities . . . are agencies or instrumentalities of the state." *Harden v. Adams*, 760 F.2d 1158, 1163 (11th Cir. 1985) (citing *Massler v. Troy State Univ.*, 343 So. 2d 1 (Ala.1977); *Ellison v. Abbot*, 337 So. 2d 756 (Ala. 1976)); *see also Cox v. Bd. of Trustees of Univ. of Ala.*, 49 So. 814, 817 (1909):

> [T]he various boards of trustees of the University of Alabama, etc., are but agents appointed by the state to manage the affairs of the University of Alabama; that, while the name of the agency has been several times changed, the legal entity of the University of Alabama has remained all the while. It therefore clearly appears that the University of Alabama, by whatever corporate name or under the control of whatever agents it may be, is a part of the state; that it was founded by the state; that it is under the state control, and that the University is therefore a public municipal corporation; that as to its lands the state is and has always been the trustee; and that the board of trustees are mere agents of the state.

15

simply not supported by the Rule 56 record.  Without question, the governance of Medical West, the health care authority, is subject to the Affiliation Agreement between the UA Board, UABHS, and the Foundation.  (Doc. # 25, Ex. D-4).  Various control rights are assigned through this agreement with no single party enjoying exclusive right to control.  (*Id.*)  The State may only indirectly control and supervise Medical West, if at all, through its authority to appoint a majority of Medical West's board members.

On one hand, Defendant argues Medical West has its own, separate board that supervises and controls the entity.  (Doc. # 34 at 4).  The Medical West Board is not a public authority itself or subject to appointment or confirmation by the Governor, Legislature, a city council, a county commission, or the general electorate.  The Foundation, an Alabama nonprofit corporation, appoints five members to Medical West's eleven-member board, and there is no requirement in Medical West bylaws, Affiliation Agreement, or HCA Act requiring that board members be officers of a governmental entity (*See* Docs. # 25, Ex. D-4 at 5; 34 at 5).  On the other hand, the UA Board appoints six of Medical West's eleven directors.  (Doc. # 25, Ex. D-4 at 5).[12]

Here, the court is called upon to decide the extent to which this organizational structure reflects control and supervision of Medical West by the State of Alabama.  At most, potential *de facto* control could be inferred from the UA Board's ability to appoint a majority of the directors of the Medical West Board.  Certainly, this appointment power is indicative of some level of control, but alone it is insufficient to suggest an "exclusive" direction and control argued for by Plaintiff.  Moreover, Directors owe their fiduciary duties to the corporation not to those who appoint them.  *See, e.g.*, *Enstar Grp., Inc. v. Grassgreen*, 812 F. Supp. 1562, 1569 (M.D. Ala. 1993) ("Corporate directors and officers have been variously described as trustees, fiduciaries,

---

[12] Currently, the UA Board and the Medical West Board share two common members.

and agents of their corporation and stockholders.  As such, they owe their corporation complete loyalty, honesty, and good faith; their first duty is to act in all things of trust wholly for the benefit of the corporation.").

Indeed, in this specific instance, the State appears to have intentionally relinquished -- and indeed insulated itself -- from direct control and supervision of Medical West.  For example, Medical West has limited, state-imposed financial reporting requirements and therefore is not required to report its income or expenditures to the State.  (Doc. # 25, Ex. M, Pennington Dep. at 68-69).  Medical West receives no appropriations from the State of Alabama (*Id.* at 77-78), meaning the State has little means of controlling or influencing Medical West's allocation of resources.  Furthermore, Medical West's directors' meetings are not subject to Alabama's Open Meeting Act (Ala. Code § 22-21-316(c)); its directors, officers, and employees are not covered by the State's ethics laws (*Id.* § 22-21-334); and it is not subject to Alabama's competitive bid requirements (*Id.* § 22-21-335).  Taken together, each of these factors suggests that the State has not subjected Medical West to public oversight and accountability.

Here, outside of the appointment of six out of eleven Board members, the court is unable to conclude that the UA Board exercises the kind of control and supervision that alone would tend to show that Medical West is a governmental "agency or instrumentality."  And for the reasons explained above, and particularly because Directors owe their fiduciary allegiance to the Board they sit upon (not to those who appoint them),[13] this is not enough to show the level of control and supervision necessary to find that Medical West is an agency or instrumentality of the State of Alabama.

---

[13] Suggesting that members of a board of directors are controlled by, and perform their duties on behalf of, those who appoint them is neither supported by logic or the law.  (This faulty argument is similar to a suggestion that judges are controlled by those who appoint or elect them).  Appointing authorities appoint board members but it does not follow *a fortiori* that they then control them.  Any assertion to the contrary is like bad plumbing — it does not withstand the pressure of close scrutiny and does not hold water.

### 5.   Creation Under Express Statutory Authority

It is undisputed that Medical West is, to some extent, a creature of statute — a factor weighing in Plaintiff's favor.  (Doc. # 22 at 25).  Medical West, like every health care authority in the State, is the product of Alabama's HCA Act.  Ala. Code § 22-21-310 *et seq*.  Defendants downplay the importance of statutory authorization to the issue, suggesting: "The same is true of every other corporation that is incorporated in Alabama. Healthcare authorities are not special in this regard."  (Doc. # 27 at 22-23).  Defendant's also suggest that because the enabling statute exempts health care authorities from complying with Alabama's Open Meeting Act, appointing public officials to their boards, State ethics laws, and State competitive bidding laws (Doc. # 22 at 9, 16, 25-26).  This factor weighs in favor of a finding that Medical West is a governmental agency or instrumentality. But, in the context of this case, it is not a significant factor.

### 6.   Degree of Financial Autonomy

Finally, and perhaps most importantly, the large degree of financial autonomy enjoyed by Medical West weighs strongly in favor of the conclusion that Medical West is not an "agency or instrumentality" for purposes of ERISA.  Medical West receives no appropriations from the State of Alabama (Doc. #25, Ex. M-13, Pennington Dep. at 77-78), is solely responsible for all of its debts and obligations (*Id.* at 70), and has limited financial reporting requirements (*e.g.*, it is not required to report its income or expenditures to the State).  (*Id.* at 68-69).

Such an expansive degree of financial autonomy -- and particularly the lack of outside funding -- not only encourages the conclusion that Medical West is not an "agency or instrumentality," but also distinguishes the present case from some of those cited by Plaintiff in which the opposite result has been reached.  For example, Plaintiff relies upon Advisory Opinion 2000-13A from the U.S. Department of Labor as a prime example of a time when an entity created under the HCA Act (the East Alabama Health Care Authority of Lee County, Alabama)

18

was deemed to be an "agency or instrumentality" under ERISA. DOL Advisory Opinion 2000-13A, 2000 ERISA LEXIS 14 (Oct. 24, 2000). However, unlike Medical West, the East Alabama Health Care Authority was "supported in part by County taxes." *Id*. The court notes that the Second Circuit's holding in *Rose* (that the Long Island Railroad was an "agency or instrumentality") also depended in large part on the Railroad's receipt of significant state funding,[14] a factual circumstance that simply does not exist here. *Rose*, 828 F.2d at 918.

In fact, Medical West's lack of outside funding, in combination with its inability to levy taxes (Ala. Code § 22-21-318(d)), removes from the equation one of the primary factors that drove Congress's exemption of "governmental plans" from ERISA. Indeed, "despite ERISA's regulatory and remedial sweep, Congress did not include public or governmental plans within its reach, believing in part, state and local governments' *ability to tax*, would enable them to operate employee welfare benefit systems that would 'avoid the pitfalls of underfunding.' " *McGraw v. Prudential Ins. Co. of Am.*, 137 F.3d 1253, 1257 (10th Cir. 1998) (emphasis added) (quoting *Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 449 (2d Cir. 1987) (citing H.R. Rep. No. 533, 93d Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Admin. News 4639)).[15] This legislative history figured prominently in the *Rose* court's determination that the Long Island Railroad was a governmental "agency or instrumentality."[16] The Railroad did not run the risk of being underfunded because it could rely upon the public revenue sources to fund its plan.

---

[14] *Rose*, 828 F.2d at 918 ("The LIRR has been, in effect, a state-owned railroad since 1966 when it was acquired by the MTA. Every year since then, the LIRR has received massive state operating subsidies.").

[15] *See also Rose*, 828 F.2d at 914 ("It was believed that 'the ability of the governmental entities to fulfill their obligations to employees through their taxing powers' was an adequate substitute for both minimum funding standards and plan termination insurance.") (quoting and citing S. Rep. No. 383, 93d Cong., 2d Sess., *reprinted in*, 1974 U.S. Code Cong. & Ad. News 4890, 4965; H.R.Rep. No. 807, 93d Cong., 2d Sess., *reprinted in*, 1974 U.S. Code Cong. & Ad. News 4670, 4756-57).

[16] *Rose*, 828 F.2d at 918 ("LIRR employees . . . like other governmental employees, can *depend on the state's taxing power* to protect their right to retirement income") (emphasis added).

Simply put, one of ERISA's principal purposes is to help assure that sufficient resources remain in retirement and other employee benefit plans. This concern is minimized in government plans where a government entity has the ability to raise taxes and protect plan funds with the guaranty of the state and federal treasuries. Where an entity (public or private) has near-complete financial autonomy (*i.e.*, the ability to fail on its own), however, Congress felt additional protective measures were necessary. In these cases, ERISA is designed to avoid the potential abuses of underfunding in nongovernmental plans.

Here, Medical West does not receive funding from the State, and neither the State, nor UABHS is responsible for Medical West's debts. Therefore, Medical West's high degree of financial autonomy strongly contributes to the court's conclusion that Medical West is not an "agency or instrumentality" for purposes of ERISA.[17] The court also concludes that this analysis is a critical factor in the analysis.

## IV.    Conclusion

Under the "NLRB test," the court finds that Medical West is not a political subdivision of the State of Alabama. Similarly, although several of the IRS's six "agency or instrumentality" factors arguably weigh in Plaintiff's favor, on balance, the factors support the conclusion that Medical West, a public corporation and health care authority, is neither an agency nor instrumentality. For these reasons, Defendant's Motion (Doc. #22) is due to be granted and

---

[17] The court recognizes that Medical West pays 25 percent of its net income to UABHS to be applied to its academic and research mission. This fact alone, however, does nothing to counter the policy rationale proffered by Defendants. Medical West does not receive funding or other appropriations from the State and is liable for its own debts and obligations; therefore, the authority is still at risk of underfunding — a key concern giving rise to ERISA. Indeed, the only hint of tangible financial assistance to Medical West in the record is testimony suggesting the authority "refinanced some tax-free bonds . . . ." (Doc. # 25, Ex. M-13, Pennington Dep. at 128:14-129:2). Without more, the record is insufficient to suggest the financial autonomy of Medical West has at any point been compromised by the refinancing of bonds.

Plaintiff's Motion (Doc. #26) is due to be denied.  A separate order in accordance with this opinion will be entered.

      **DONE** and **ORDERED** this September 16, 2014.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE